```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re:                                              Chapter 11

DELAFIELD 246 CORP.,                                Case No. 05-13634 (ALG)

                              Debtor.

-------------------------------------------------------------------x
DELAFIELD 246 CORP.,

                              Plaintiff,

            -against-                               Adv. Proc. No. 05-01834 (ALG)


THE CITY OF NEW YORK, et al.

                              Defendants.

-------------------------------------------------------------------x
```

## MEMORANDUM OF OPINION

A P P E A R A N C E S:

LAW OFFICE OF STEVEN COHN, P.C.
Counsel for Delafield 246 Corp.
  By:   Daniel A. Zimmerman, Esq.
One Old Country Road
Suite 420
Carle Place, New York 11514

NEW YORK CITY LAW DEPARTMENT
Counsel for the City of New York
 By:   Hugh H. Shull, III, Esq.
       Lawrence Jay Brenner, Esq.
       Lonica L. Smith, Esq.
100 Church Street
New York, New York 10007

OCHS & GOLDBERG, LLP
Counsel for NYCTL 2005-A Trust
  By:  Martin P. Ochs, Esq.
60 East 42nd Street
Suite 1545
New York, New York 10165

ROBINSON BROG LEINWAND GREENE GENOVESE & GLUCK, P.C.
Counsel for Delafield Homeowners Association, Inc.
  By:  Christine H. Black, Esq.
1345 Avenue of the Americas
31st Floor
New York, New York 10105

**ALLAN L. GROPPER
UNITED STATES BANKRUPTCY JUDGE**

The Debtor is a single asset real estate corporation that owns 24 out of 33 lots (22 of which are unimproved) that comprise a development in Riverdale, New York known as Delafield Estates.  Delafield Estates initially included the Delafield Mansion (since destroyed by fire) and other property that was restricted as to site management, preservation and restoration.  As early as 1980 a Delafield Estates Homeowners Association, Inc. (the "Association") was incorporated, and by 1987 approximately 11 individual units had been built and at least 9 had been sold.   In that year the then owner transferred title to the common area, consisting of approximately 7.4 out of 10.4 acres, to the Association.

By 1988 the owner encountered financial difficulties, the property was foreclosed by the lender, and the foreclosing mortgagee entered into an "In Rem Agreement" with the City of New York regarding unpaid taxes for the tax periods from 1987 to 1990.  The In Rem Agreement provided in substance that the tax arrears, which had become a lien on the property under applicable law, would be paid off by the mortgagee over time, with

periodic payments and a balloon payment at the end. It appears that the tax arrears were all assessed against the main property ("Lot 407"), that some of the individual plots had never been subdivided out for tax purposes, and that some of the new buyers paid (or tried to pay) a proportionate amount of the taxes that were arguably due with respect to their share of the whole "to extricate their Lots from the general problems of the Developer." (4/7/06 Affirm. of Daniel Zimmerman, counsel for the Debtor, ¶ 20.)

In any event, the Debtor paid $1 million at a foreclosure sale in 1991 for the remaining 24 lots still to be developed. The foreclosure had been subject to the outstanding tax assessment and liens, and there is no dispute that the Debtor received at the time a statement of taxes due on its property of approximately $889,933 as of March 14, 1990. There is also no dispute that there then began a 15-year struggle between the Debtor and the City over these unpaid taxes, which have increased in amount to $7,379,469.18 as of January 2, 2007, by virtue of the passage of the years and the accrual of interest.[1] This 15-year war has included the following battles, almost every one of which the Debtor has lost or abandoned:

1. The first battle was commenced by Debtor's predecessor, the mortgagee of the project, which claimed in a 1990 petition for judicial review pursuant to Article 7 of the New York Real Property Tax Law ("RPTL") that the 1989/90 assessments on Lot 407 were illegal, excessive, unequal and unlawful. The petition was dismissed as abandoned in 1994, after the Debtor had succeeded to the property.

2. The Debtor also requested judicial review of the determinations as to the tax assessments for the tax years 1992/93 and 1993/94 by filing Article 7 petitions in October

---

[1] As discussed below, the City has agreed that there are reductions or offsets that would reduce the balance owed as of January 2, 2007 to no more than $5,306,739.38.

3

1992 and October 1993, respectively. Both made complaints similar to those in the 1989/90 petition and both met the same fate, being dismissed as abandoned in 1996 and 1997, respectively.

    3. After it purchased the property in 1991, the Debtor continued to pay the tax arrears under the above-mentioned In Rem Agreement entered into by its predecessor. That agreement required the taxpayer to pay current taxes, and with respect to the arrears, an initial down payment of $133,485 and quarterly installments of $23,638, with a final lump sum payment of the balance (or, if the City agreed, additional installments). The last periodic installment payment was made in 1998, at which time there was an outstanding balance of $1.3 million claimed by the City. The Debtor asserted that the 26th and final installment payment had the effect of satisfying the debt, and it ceased making payments on the outstanding balance of the old taxes. As a consequence, the City commenced foreclosure proceedings, and the Homeowners Association sought to have the common area, which was still included as part of Lot 407 with the Debtor's 24 lots for tax purposes, assessed separately so that it would not be involved in a foreclosure. In November 1998 the Debtor's property was subdivided from the Association's property and the Debtor's property was assigned 24 tax lot numbers. At some point it also appears that the assessed taxes were apportioned and distributed among the lots.

    The City eventually gave the Debtor notice of its intention to include the tax liens, which remained outstanding on the Debtor's property, in a 2002 sale of liens, and the Debtor in response commenced a proceeding pursuant to Article 78 of the CPLR to challenge the City's liens and continued assessments.[2] Although the Debtor was initially

---

[2] The City withdrew the liens from the 2002 sale but eventually sold the tax liens in 2005. The purchaser of the liens at that sale is a party to these proceedings.

4

successful in the State Supreme Court, the Appellate Division reversed. *Matter of Delafield 246 Corp. v. City of New York*, 11 A.D.3d 268, 782 N.Y.S.2d 441 (1st Dept. 2004). Among other things, the appellate court held that the trial court "was without authority to invalidate a decade-old tax lien", and that "even had this proceeding been properly brought under Delafield's theory, such proceeding would have been time-barred given that, since the purchase of the subject property, Delafield [the Debtor] was in regular receipt of tax bills reflecting the exact amounts of the unpaid delinquent taxes and accruing interest." The Court also noted that, "[i]n November 1998 the property was subdivided by Delafield into 24 separate tax lots and the total arrears were apportioned among those 24 new lots. Tax bills and delinquency notes listing the proportionate shares of the arrears were sent to Delafield. Delafield, however, did not make any payments towards the arrears." The Court's conclusion was:

> In the instant case, it is undisputed that the delinquent taxes for the years at issue were lawfully assessed and levied. Consequently, it would be impossible to construe the Agreement as an installment payout plan that effectively would have reduced the tax obligation that arose by operation of law rather than as a forbearance agreement which contemplated a final balloon payment.

11 A.D.3d at 272. Leave to appeal to the Court of Appeals was denied. 4 N.Y.3d 703, 825 N.E.2d 133, 792 N.Y.S.2d 1 (2005). Notwithstanding the Debtor's loss, it has not made any payments on the tax liens outstanding on its property since 1998, and interest has continued to accrue at the same rate charged to all other delinquent taxpayers. As noted above, the total claimed lien as of January 2, 2007 was more than $7.3 million.

    4. From a date long before the Debtor's defeat in the Appellate Division, the Debtor and the Homeowners Association were engaged in a battle of their own. The Association had sued the Debtor for failure to pay common charges assessed against its

5

24 lots (out of 33 lots in total). That case reached the Appellate Division even before the 2004 decision mentioned above, and again the Debtor was unsuccessful. *Delafield Estates Homeowners Assoc., Inc. v. Delafield 246 Corp.*, 280 A.D. 2d 437, 721 N.Y.S.2d 621 (1st Dept. 2001). The Court held that the Debtor was liable for common charges, even though it had only one vote in the Association. However, it also held that issues of fact existed as to damages, "including why the same common charge was assessed against [the Debtor's] largely unimproved lots as was assessed against the improved lots of the other lot owners…." It further found that "[t]he record is also insufficient to determine [the Debtor's] claim that when it purchased its lots at foreclosure, it paid the back taxes of not only its own lots but also the lots of the other owners, entitling it to a setoff against any common charges it owes."

     5. The Debtor's litigation with the Homeowners was finally scheduled for trial on December 1, 2004. Two days before, on November 29, 2004, the Debtor filed a Chapter 11 petition in the U.S. Bankruptcy Court for the Eastern District of New York, staying the State case. The Debtor also filed an "Omnibus Complaint to Determine Validity and Extent of Liens, Recovery from Individual Defendants and Seeking Declaratory Relief," which purported to assert in a bankruptcy court adversary proceeding the Debtor's claims against (i) the Association and its members, and (ii) the City with respect to the outstanding taxes and the City's tax liens. The Association promptly moved for relief from the stay, which the Court, per Judge Stan Bernstein, granted in a memorandum decision dated April 28, 2005. Citing *In re Sonnax Industries, Inc.*, 907 F.2d 1290 (2d Cir. 1990), the Court determined that it would be appropriate for the issues in the State litigation to be determined in State court because

6

> the State Court has already made dispositive determinations regarding the liability of the debtor and allowing the matter to continue in the State Court will result in a complete resolution of the Association's claim; (2) allowing the matter to continue in the State Court, pending since 1995, will not prejudice any other creditors because the confirmation of a plan of reorganization is greatly dependent on the resolution of the Association's claim; (3) it is in the interests of judicial economy to have the State Court, which is wholly familiar with the disputed facts and issues, complete the resolution rather than having this Court start anew; (4) this matter is ready for trial in the State Court, and would have been tried, but for the petition, in December 2004; further, since the State Court is ready for trial, this matter should be tried more expeditiously and efficiently than it will be in this Court.

(Mem. and Order, p. 2.)  In addition, Judge Bernstein went further and dismissed the Omnibus Complaint "because it substantially overlaps with the issues to be determined in State Court."  He also struck from the calendar a plan and disclosure statement filed by the Debtor, and he *sua sponte* transferred the entire case to this Court on the ground that it involved real property located in the Southern District of New York.

6. Again undeterred by a complete loss, the Debtor appealed the order of the Bankruptcy Court and moved for a stay pending appeal.  In a nine-page decision dated May 27, 2005, District Judge Seybert denied the request for a stay on the ground that "the Debtor has failed to demonstrate a likelihood of success on the merits."  (p. 4.)  The Court held that the Debtor's contentions that the State court could not decide all the issues with the Homeowners, such as the Debtor's alleged payment of taxes that should have been paid by the Homeowners, "are belied by the Appellate Division's decision in *Delafield Estates Homeowners Association, Inc. v. Delafield 246 Corp.*, which expressly anticipates several issues to be resolved at trial, including the Debtor's contention that 'it paid the back taxes of not only its own lots but also the lots of the other owners, entitling it to a setoff against any common charges it owes.' 280 A.D.2d 437 (1st Dept 2001)."

7

(Decision at 7.) Judge Seybert also held that the Bankruptcy Court's "*sua sponte* dismissal of the Omnibus Complaint was a necessary corollary to the Order lifting the stay of the State Action." (Decision at 8.)

      7. After transfer of the case to this Court, the Debtor paid little if any heed to the decisions of the Eastern District Bankruptcy and District Courts and resumed its litigation program. It refiled its Omnibus Complaint with a few changes, including as Count 1 the claims against the City with regard to the tax liens, and it later amended the Complaint to include two new tax counts against the City (Counts 19 and 20). These Counts assert in substance that the tax liens are illegal for multiple reasons, that the apportionment of taxes between the Debtor's property and the property of the Association and the individual homeowners is invalid, illegal and a violation of the equal protection clauses of the Fourteenth Amendment and the New York Constitution, and that the Debtor is "entitled to recover from the City such taxes as were improperly billed to the Debtor's lots due to the invalid and/or illegal apportionments and paid by the Debtor." (Amended Complaint, Count 20, p. 67.)[3] The rest of the claims are against the Homeowners Association and the individual homeowners and assert, among many other things, that taxes apportioned to the Debtor should have been apportioned to the Association or to the individual homeowners. The Debtor's Complaint also repeats many, if not all of the claims in the State court litigation with the Homeowners Association, although for good measure the Debtor also removed that pending action to this Court.

      8. When the chapter 11 proceedings were transferred to this Court, it first insisted that the Debtor turn to the question of restoration of the property, an issue that

---

[3] The Debtor has since conceded that under the circumstances of this case this Court has absolutely no power to order the City to refund taxes, whether "improperly billed" or not.

8

appears to have received insufficient attention over the past 10-15 years. It appeared that without a restoration plan, the Debtor could never receive necessary City approvals to market the remaining lots. Although progress has been exceedingly slow, the Debtor has to date retained a surveyor, land use counsel, and civil engineers, and it appears to be taking steps to restore the property to marketable condition. The relevant City agencies have apparently cooperated. The Debtor has also made it clear, on the record, that its commitment to restore the property is unqualified and that, in its view, there is enough value in the remaining lots held for sale to provide an economic incentive to complete the restoration and sell the remaining lots even if it loses the tax litigation. On another positive front, the Debtor has also agreed to a moratorium on litigation with the Homeowners Association and the homeowners and has entered into 16 stipulations extending the time to answer or to move to remand the State complaint.[4]

9. The Debtor has not, however, entered into an effective truce with the City on the tax issues. As noted above, the Omnibus Complaint filed in this Court contains three counts against the City with regard to taxes. The City's first formal response to these counts was to move to dismiss them under Rule 12(b)(6), made applicable by Bankruptcy Rule 7012, or in the alternative to have the Court abstain under §505(a)(1) of the Bankruptcy Code and/or 28 U.S.C. §1334(c)(1). The Debtor responded by asserting that the City's motion should be considered as one for summary judgment, as the City had relied on material outside the pleadings, and the Debtor requested discovery with respect thereto. Moreover, despite demanding discovery on various of the issues, the Debtor filed its own motion for partial summary judgment based, among other things, on

---

[4] One of the individual homeowners has moved to dismiss for reasons personal to her, and that motion is *sub judice*.

9

documents it had obtained under the State Freedom of Information Law ("FOIL").  It later filed a supplemental motion raising a new issue relating to the interest rate charged by the City under the installment agreement mentioned above.  The City responded by filing its own amended motion for summary judgment, based on many of the same issues in the Debtor's motion but with a demand that, if necessary, this Court make a final determination in its favor on the tax issues raised by the Debtor.  The Debtor has attacked that response at great length, the City has responded, and the last pleading on file is the Debtor's purported sur-reply.

Although an enormous amount of material has been produced on the tax matters, the dispositive issues in this case are (i) whether the 2004 Appellate Division decision represented an "adjudication" with respect to the taxes at issue within the meaning of 11 U.S.C. §505(a)(2)(A) barring any further review in this Court; and (ii) whether, in any event, the Court should abstain under §505(a)(1).  For the reasons stated hereafter, the Court finds that (i) the 2004 Decision was an adjudication of the amount of the taxes at issue, depriving this Court of jurisdiction over the dispute under §505(a)(2)(A); and (ii) even if the 2004 Decision were not an adjudication of all of the tax issues, this would be a textbook case for abstention under §505(a)(1) of the Bankruptcy Code.  The Complaint must therefore be dismissed as against the City.

Discussion

The Amended Complaint does not even mention the provision, but there is no dispute that the jurisdiction of this Court to determine the validity of the City's tax claims against the Debtor is subject to 11 U.S.C. §505, entitled "Determination of tax liability." Section 505 provides, in applicable part:

10

> (a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.
>
> (2)  The court may not so determine –
>
> (A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title . . . .

In *Cody v. County of Orange (In re Cody, Inc.)*, 338 F.3d 89, 92  (2d Cir. 2003), the Second Circuit held that in a dispute involving §505(a), it is the duty of the Bankruptcy Court first to determine whether "the amount or legality" of a tax was, within the meaning of §505(a)(2)(A), "contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title…"  In the event this question is answered affirmatively, the Court must dismiss the case for lack of jurisdiction rather than abstain.  In the event that a claim is not dismissed for lack of jurisdiction, the Court should consider whether to abstain under §505(a)(1).  *Cody*, 338 F.3d at 94.

Section 505(a)(2)(A)

There is no dispute that the taxes and tax liens at issue relate to the taxes that were originally assessed for the 1988/89 tax years and have ballooned as a consequence of the accrual of interest.[5]   The City contends that the 2004 decision of the State court adjudicated all of the tax issues relating to this assessment adversely to the Debtor.  The Debtor argues that the Appellate Division decision merely held that the State Court

---

[5] The City has calculated that of the $7.3 million nominally at issue, only $15,658.97 is attributable to taxes initially assessed after 1988/89. The Debtor has not complained about this portion of the tax assessment and apparently is not substantively challenging this *de minimis* portion of the liens.

11

lacked "jurisdiction" over the Article 78 proceeding or that an Article 78 proceeding was time-barred, and that the decision was not a "adjudication" within the meaning of §505(a)(2)(A) and not entitled to any *res judicata* or precedential value.

The Appellate Division did not hold that the proceeding before it was void for lack of jurisdiction; it stated at most that Article 78 jurisdiction was "arguable." Although the Court also said the proceeding would have been time-barred if it had been properly brought under Article 78, it ruled on the merits as well. The Appellate Division decision expressly disposed of all of the Debtor's arguments with regard to the original tax assessment in 1988/89, with the result that these claims are barred by §505(a)(2)(A) as well as by principles of *res judicata* as applied in *In re Cody*, 338 F.3d at 92.

Moreover, even if the Appellate Division had merely dismissed the Debtor's challenge to the tax assessment on statute of limitations grounds, the dismissal would have been an adjudication for purposes of *res judicata* as well as §505(a)(2)(A). As the Second Circuit has stated, "Because New York treats a dismissal on statute of limitations grounds as a final judgment on the merits for *res judicata* purposes, [a litigant] is precluded from relitigating her … claims in federal court…. Once a plaintiff has entered the state court system, she is bound by the preclusion rules governing that system, and the federal courts in turn must respect the finality of the judgments that issue from the state courts." *Bray v. New York Life Insurance*, 851 F.2d 60, 62 (2d Cir. 1997); *see also EFCO Corp. v. U.W. Marx, Inc.*, 124 F.3d 394, 397-98 (2d Cir. 1997); *Kirkland v. City of Peekskill*, 828 F.2d 104, 109 (2d Cir. 1987).

A further question is the scope of the bar created by the Appellate Division decision. The Debtor's current tax claims relate to the apportionment of the 1988/89 tax

12

liability among the Debtor's 24 lots. This apportionment was made in 1998-1999, almost 10 years after the taxes were initially assessed, and the Debtor asserts that the old liability was not fairly apportioned among its lots and that part of it should have been assessed to the property belonging to the Homeowners Association or the individual homeowners. In its Rule 7056.1 statement as to material facts in dispute, the Debtor identified 12 alleged material facts as to which "there is or may be a genuine issue to be tried." (7056.1 Statement at 33) All of these issues relate to the apportionment that was effected during the 1998-1999 period.[6] Although the Debtor attempts to dress these disputes in the garb of a Constitutional (equal protection) violation, what is at stake is the apportionment of tax liability among the Debtor's property, the Homeowners Association's property (the common area) and the property of the individual homeowners.

There is no question that the apportionment took place prior to the Appellate Division decision mentioned above; the decision so recites:

> In November 1998, the property was subdivided by Delafield into 24 separate lots and the total arrears were apportioned among those 24 new lots. Tax bills and delinquency notices listing the proportionate shares of the arrears were sent to Delafield. Delafield, however, did not make any payments towards the arrears.

11 A.D.2d at 270. Moreover, there is no question that the Debtor raised the issue in the Article 78 proceeding. Paragraphs 21-23 of the Petition dated May 22, 2002, complain specifically about the apportionment of the taxes between the Debtor's property and the property of the individual homeowners ("Upon information and belief, the DOF

---

[6] The Debtor contends that the issue that it seeks to litigate in this Court is not the assessment of taxes but "the improper apportionment of properly assessed taxes as against its 24-Lots rather than the property of others." Debtor Mot. for Summ. J. #1 at 47; *see id.* at 31, n. 61 ("the Complaint does not contest the assessor's valuation of the Debtor's lots or of old tax lot 407, but questions the allocation and/or apportionment of validly assessed taxes as against its 24 lots.")

13

[Department of Finance] is not billing the 9 homeowners for allegedly unpaid 1989 and 1990 real estate taxes.") In ¶ 32 of the Petition, summarizing the action of the City said to be "arbitrary and capricious," the Debtor complained, among other things, "Upon information and belief, Respondents are not billing the 9 homeowners from former lot 407 for past due real estate taxes for 1989 and 1990 but are arbitrarily casting the entire burden upon Petitioner." The affidavit of the Debtor's principal in support of the Petition states, "Upon information and belief, the DOF is not billing the 9 homeowners for allegedly unpaid 1989 and 1990 real estate taxes and is maliciously and arbitrarily casting the entire alleged tax burden of old Lot 407 on Delafield." Aff. of Abraham Zion, sworn to May 22, 2002, ¶ 21.

As noted above, the Appellate Division decision expressly adverted to the apportionment issue. The Court stated, "In November 1998, the property was subdivided by Delafield into 24 separate tax lots and the total arrears were apportioned among those 24 new lots." 11 A.D.2d at 270. On the other hand, the Appellate Division, while finding that the "delinquent taxes for the years at issue were lawfully assessed and levied," did not make any finding expressly related to the issue of apportionment. The conclusion of its decision concentrates on another issue -- the issue that the Debtor apparently pressed most vigorously and on which it had been successful in the lower court -- whether the In Rem Agreement released the Debtor from the taxes at issue.

Notwithstanding the limited scope of the State Court's express findings, §505(a)(2)(A) does not require that a tax issue be "determined" by a State court. *See Baker v. Internal Revenue Serv. (In re Baker)*, 74 F.3d 906, 909 (9th Cir. 1996); *see also In re Cody*, 338 F.3d at 96, n.5. The taxes need only be "adjudicated." In the context of

14

§505(a)(2)(A), adjudication has been defined as being "'synonymous with adjudge in its strictest sense.'" *IRS v. Teal (In re Teal)*, 16 F.3d 619, 621 (5th Cir. 1994). As the Court held there, "a matter has been 'adjudicated' when a 'judgment of a court of competent jurisdiction' has been decreed." *Id.*; *see also In re Baker*, 74 F.3d at 909. Moreover, §505(a)(2)(A) requires only that the "amount" *or* the "legality" of the tax have been adjudicated. The Debtor brought its Article 78 proceeding in 2002 because of the City's abortive attempt at that time to sell the tax liens on the property and the Debtor's fear that the purchaser would be able to foreclose. The stated purpose of the Article 78 proceeding was, among other things, to obtain a "judgment against Respondents … declaring the invalidity of said Tax Liens, directing the New York City Department of Finance to correct its records to indicate that all said Tax Liens have been paid." Verified Pet., ¶ 35(b). The "amount" and the "legality" of the tax and the tax liens were directly at issue and were adjudicated by the State court.

It has also been observed that "*res judicata* is 'closely related, if not identical' to issues regarding the Bankruptcy Court's authority under Section 505…. Section 505(a)(2)(A) 'expresses in jurisdictional terms the traditional principles of *res judicata* or claim preclusion.'" *In re Baker*, 74 F.3d at 910, quoting *In re Teal*, 16 F.3d at 621, n.3, and *Doerge v. United States (In re Doerge)*, 181 B.R. 358, 364 (Bankr. S.D. Ill. 1995). Under traditional principles of *res judicata*, a final judgment in an earlier action between the parties precludes relitigation of "issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *see also Commissioner v. Sunnen*, 333 U.S. 591, 597 (1948); *In re PCH Assocs.*, 949 F.2d 585, 594 (2d Cir. 1991). In this case the apportionment issue not only could have been raised in the Article 78

15

proceeding, it *was* raised in the Article 78 proceeding, and if the Debtor had been successful in pursuing it, the amount of the tax liens would have been lower. The Debtor may have put more emphasis in its litigation on the construction of the In Rem Agreement, and it was successful on this issue in the Supreme Court, but the apportionment issue also directly affected the "amount" of the taxes that the Debtor was contesting, and the amount and legality thereof were "adjudicated" for purposes of §505(a)(2)(A). This Court does not have jurisdiction to review the State adjudication.

Section 505(a)(1)

Even if the apportionment issue were still open and a redetermination of this portion of the taxes and tax liens were not barred by the prior State court adjudication under §505(a)(2)(A), a further question is whether this Court should decide the issue or abstain. In *In re New Haven Projects Ltd.*, 225 F.3d 283 (2d Cir. 2000), the Second Circuit held that when Congress provided in §505(a)(1) that the Bankruptcy Court "may" under certain circumstances determine a Debtor's taxes, it meant "may" and not "must," and that this Court has broad discretion under §505(a)(1) to abstain from such a determination. It held that abstention would be proper even if it were clear that the Debtor would be barred from any remedy by State statutes of limitation and the bankruptcy proceedings were the Debtor's only avenue for relief.[7]

The *New Haven Projects* court identified "a number of factors" that the bankruptcy courts have looked to "when deciding whether to exercise their authority

---

[7] At the time of the decision in *New Haven Projects*, and at the time this Chapter 11 proceeding was filed, §505(a) did not preclude the redetermination of a tax liability for *ad valorem* taxes that would otherwise have been barred by State statutes of limitation. The 2005 Amendments to the Bankruptcy Code added §505(a)(2)(C), which provides that the Bankruptcy Court cannot determine "the amount or legality of any amount arising in connection with an *ad valorem* tax on real or personal property of the estate, if the applicable period for contesting or redetermining that amount under any law (other than a bankruptcy law) has expired."

16

under 11 U.S.C. §505," including the following six. 225 F.3d at 289. These six factors, and others that are particularly relevant to this case, establish that the Court should abstain from deciding any unadjudicated tax issues between the Debtor and the City.

The first four factors identified by the *New Haven Projects* Court go to the complexity of the tax issue, the need to administer the bankruptcy case in an expeditious fashion, the burden on this Court's docket, and the length of time needed to reach a decision. As to complexity, the Debtor has filed hundreds of pages of assertions, counter-assertions, accusation and complaint regarding taxes that go back either 8 years or 18 years. It has frequently quoted specific excerpts from assessment roles from the early 1990's that it obtained from FOIL requests. It could not have done a better job in establishing that if any of the issues were still open, they would be complex, burdensome, and with a lengthy lead-time to ultimate decision.[8] As to the need to administer the bankruptcy case in an expeditious fashion, the outstanding tax issues have complicated rather than facilitated the adoption of a restoration plan that is critical to the Debtor's ability to sell the remaining lots and/or get out of bankruptcy successfully. It would be to the advantage of all parties if the Debtor were required to concentrate all of its efforts in this Court on completing the restoration plan and not be deflected by an ancient tax dispute.

The fifth factor cited by the Circuit Court is the "asset and liability structure of the debtor." In this case it is clear that the 24 lots retained by the Debtor have appreciated in value even more quickly than the City's interest has accrued. The Debtor cannot argue

---

[8] As one example of the Debtor's practice, the Debtor claimed in one of its myriad pleadings that the City had charged it an unlawful interest rate on the In Rem Agreement. The City pointed out in its response that the Debtor relied on an interest rate that was in effect only for installment agreements entered into between September 1, 1978 and January 31, 1979. That "issue" has not been pursued.

17

that its ability to confirm a plan and reorganize rests on a favorable disposition of the tax issues.

The sixth and final factor recognized in the *New Haven Projects* case is "the potential prejudice to the debtor, the taxing authority, and creditors." The Court's decision was strongly influenced by the fact that in *New Haven Projects* only an insider would "likely benefit from Section 505 review," and it held that the statute was "not enacted to afford debtors a second bite at the apple at the expense of outside creditors." 225 F.3d at 289. The outside creditors there were the taxing authority and a third party that had purchased the municipality's tax lien. The facts here are substantially the same. There are virtually no parties in interest, other than the Association and its members, and neither the Association nor its members have taken the Debtor's side in its dispute with the City. The other third parties are the City and a purchaser at a tax lien sale. The only beneficiaries of a tax redetermination would be the Debtor's insiders.

Moreover, during the course of this litigation, the Debtor reserved its most strident accusations of bad faith for the alleged failure of the City to take account of the following two matters. Although the Debtor's accusations of misrepresentation and bad faith have been meritless, the Debtor did establish that the tax records show (i) a credit in an amount of between $182,000 and $185,000 that was never applied in the Debtor's favor;[9] and (ii) a clerical error in the amount of the tax liability that was apportioned to the Debtor's property in 1998 or 1999.[10]  Although the City has defended its position on

---

[9] The Debtor claims that the credit is $185,222.05. The City has calculated that the Debtor made a total of $182,592.32 in partial payments toward the tax liability that first became due in 1989. The City's formal position is that if the Debtor were to apply for a refund based thereon, the Debtor could elect to transfer these payments among the tax lots it owns (or some of them) and reduce the aggregate total of the tax liens by $946,388.39 as of January 2, 2007. The Debtor and the City are at present checking these numbers.
[10] The City does not dispute that the tax liability that was apportioned to the Debtor's 24 tax lots in 1999 was overstated by $69,203.64 for the periods beginning July 1, 1989 and January 1, 1990 because there was

18

both issues, it has agreed to both of these adjustments. The parties are apparently reviewing the exact amounts, but it appears that correction of the error and application of the credit would reduce the tax liens from $7,379,469.18 as of January 2, 2007 to no more than $5,306,739.38. These adjustments deprive the Debtor of any basis for a claim of bad faith and inequitable treatment.

In addition, the principle of abstention under §505(a)(1) is based on respect for State law and State judicial processes. *See generally In re Cody*, 338 F.3d 89. The basic grant of Federal bankruptcy jurisdiction also contains a broad grant of discretion to abstain "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. §1334(c)(1). Assuming *arguendo* that the Debtor had raised a reasonable doubt that the Appellate Division did not adjudicate the "apportionment issue" in its 2004 decision, there can be no doubt that the State courts are the best judges of what they did and did not decide. Where the issues may be close as to the *res judicata* effect of a prior State court adjudication, and where application of §505(a)(2)(A) may be in doubt, §505(a)(1) points clearly in the direction of abstention and referral of any remaining issues back to State courts.

## Conclusion

The Debtor's remaining claims relating to its taxes and tax liens have been adjudicated in the State court and are dismissed for lack of jurisdiction under §505(a)(2) of the Bankruptcy Code. Even if they were not, the Court would abstain from deciding the claims under §505(a)(1). The City is directed to settle an order on ten days' notice

---

a failure to deduct the tax liability that had already been transferred to four lots owned by individual homeowners. *See* letter dated Jan. 5, 2007 from the Corporation Counsel's office to the Court. The City has calculated that, as of January 2, 2007, taking into account the accrual of interest, the Debtor would be entitled to an offset of $1,126,341.41.

19

providing for the two agreed adjustments referred to above (see notes 9 and 10) and otherwise dismissing, or in the alternative abstaining from, the Debtor's tax claims against the City.

Dated: New York, New York
April 25, 2007

                                          */s/ Allan L. Gropper*
                              UNITED STATES BANKRUPTCY JUDGE